CORPORATE PROPERTY ASSOCI-
ATES 6 and Corporate Property
Associates 7, Plaintiffs

v.

THE HALLWOOD GROUP
INCORPORATED,
Defendant.

The Hallwood Group Incorporated,
Counterclaim Plaintiff

v.

Corporate Property Associates 6 and
Corporate Property Associates 7
Counterclaim Defendants.

C.A. No. 15661–NC.

Court of Chancery of Delaware,
New Castle County.

Submitted: Sept. 24, 2001.
Decided: Feb. 25, 2002.

Thomas R. Hunt, Jr., and Matt Neiderman of Morris Nichols Arsht & Tunnell, Wilmington; and Ben Burke Howell of Reed Smith LLP, Philadelphia, PA, for Plaintiffs/Counterclaim Defendants.

Lawrence C. Ashby, Richard Heins and Joseph C. Handlon of Ashby & Geddes, Wilmington; Charles A. Crocco, Jr. of Crocco & De Maio, P.C., Mount Kisco, NY, for Defendant/Counterclaim Plaintiff.

## OPINION

JACOBS, Vice Chancellor.

The dispute in this action concerns the validity of an August 21, 1996 Letter Agreement between the plaintiffs, Corporate Property Associates 6 and Corporate Property Associates 7 (together "CPA"), and the defendant, the Hallwood Group Incorporated ("Hallwood"). Under that Agreement, Hallwood prepaid the principal owed on a $500,000 note made payable to CPA in exchange for a release of all claims, including CPA's claim for a $500,000 participatory interest in certain Hallwood partnership units that collateralized the note.

In 1997, CPA filed this action for a determination that the Letter Agreement was invalid because, among other reasons, Hallwood had procured it inequitably and in violation of an earlier Settlement Agreement that had given rise to the $500,000 note. Hallwood counterclaimed for a determination that the Letter Agreement was valid and enforceable in all respects. The merits of the claims and counterclaims were tried on June 25, 2001.[1] This is the Opinion of the Court, after trial and post-trial briefing. I conclude herein that the Letter Agreement, including the general release it contains, is valid and enforceable, and that judgment on all claims and counterclaims should be entered in favor of Hallwood.

## I. RELEVANT FACTS

The pertinent facts are largely undisputed. Where there are disputes, the facts are as found below.[2]

The plaintiffs are both California limited partnerships that are affiliates of W.P. Carey and Co., Inc. ("Carey"). Carey is an affiliate of WP Carey & Co., LLC, a publicly traded company that acquires, owns, and manages industrial and commercial properties, and whose shares are listed on the New York Stock Exchange. The defendant, Hallwood, is a Delaware corporation whose principal offices are located in Dallas, Texas.

The dispute between the parties originated in January, 1994. At that time the parties disagreed over the amount Hallwood owed to CPA under a January 27, 1992 promissory note in the principal amount of $1,613,350 (the "Hallwood Note"). The Hallwood Note was made payable to Integra–A Hotel and Restaurant Company ("Integra"). Integra later pledged the Hallwood Note to secure its subsidiaries' obligations under a lease of property from CPA. In July 1992, Integra filed for Chapter 11 bankruptcy. Thereafter, in settlement of certain claims of CPA, Integra transferred its rights under the Hallwood Note to CPA.

Hallwood, as the obligor on the Hallwood Note, claimed certain set-off rights against that Note. To settle the dispute over the amount Hallwood owed under the Hallwood Note, CPA and Hallwood entered into a Settlement Agreement on January 21, 1994. Under the Settlement Agreement, Hallwood executed in favor of CPA a new, superseding note (the "New Note") in the principal amount of $500,000. The New Note called for quarterly payments of interest to CPA at the rate of 8%. Unless otherwise directed, Hallwood was

1. The trial record consists of the testimony of two witnesses, Joseph Koenig and Melvin Melle of Hallwood; plus the trial exhibits and deposition testimony of other witnesses that were admitted into evidence without objection.

2. Recited in this section of the Opinion are the fundamental facts that underlie the parties' dispute. Other facts are discussed in Section III (Analysis) as they become pertinent.

required to deliver the payments to CPA care of Carey at Carey's New York office. The New Note allowed Hallwood to prepay it before its March 8, 1998 maturity date, unless certain specified events had occurred beforehand.

Concurrently with executing the Settlement Agreement and the New Note, the parties executed a Pledge and Security Agreement (the "Security Agreement"). In the Security Agreement, Hallwood pledged 446,345 units of Hallwood Realty Partners, L.P. (the "HRP units") as security for the New Note. Hallwood also granted CPA a contingent participatory interest in those HRP units. That participatory interest entitled CPA to receive from Hallwood (in addition to and apart from the $500,000 New Note) an amount equal to 25% of the increase in value (if any) of the HRP units during a specified time period, up to $500,000. Under this arrangement, CPA would (and did) retain possession of the 446,345 HRP units pledged by Hallwood under the Security Agreement.

In January 1996, Joseph Koenig, Hallwood's Controller and Treasurer ("Koenig"), suggested to Melvin Melle, Hallwood's Chief Financial Officer and Secretary ("Melle"), that Hallwood consider prepaying the New Note, at a discount, before maturity. Melle rejected that suggestion because at that time Hallwood lacked sufficient funds to prepay the New Note, even at a discount.[3]

Although Hallwood remained a financially distressed company, between January and July 1996 its financial position had improved somewhat. In July 1996, Mr. Koenig again suggested to Mr. Melle that Hallwood consider prepaying the New Note at a discount. This time, Mr. Melle authorized Mr. Koenig to discuss with

CPA the possibility of such a prepayment. Accordingly, in mid-July 1996, Mr. Koenig contacted his CPA counterpart, Mr. Robert Kehoe, an accountant at CPA. Mr. Koenig asked Mr. Kehoe if CPA would be interested in a transaction involving a prepayment of the New Note at a discount. Mr. Kehoe responded that he lacked authority to decide whether CPA would agree to such a proposal, and told Mr. Koenig to direct his proposal to Anthony Mohl, a first vice president of Carey and CPA.

Following those instructions, Mr. Koenig sent a letter to Mr. Mohl on July 23, 1996. In that letter Mr. Koenig proposed that on or before August 31, 1996, Hallwood prepay the $500,000 remaining principal amount of the New Note, plus accrued interest which, as of August 31, 1996, was $10,082.19. Mr. Koenig's letter further stated that in exchange for the prepayment of the New Note, "Hallwood will have no further obligations to the Payees."[4] The Koenig letter was drafted in contract form, and the second page had a signature line for Mohl to execute on behalf of CPA.

It is undisputed that in advancing this proposal, Hallwood intended to prepay the $500,000 principal balance plus all accrued interest approximately 19 months before the New Note matured. In exchange for that prepayment, Hallwood would have no further liability or obligation, including any obligation to pay to CPA its contingent participatory interest, which at that point was worth $500,000. Mr. Koenig's letter did not expressly spell out that latter point, but that term was implicit. Koenig's letter did specify that if Hallwood's proposal was accepted, the transaction

---

**3.** As of December 1995, Hallwood owed almost $100 million of liabilities and had a zero ($0) net worth.

**4.** Joint Exhibit ("JX") 5, at 2.

would involve CPA returning to Hallwood the canceled New Note (which would be marked "paid-in-full"), plus delivering to Hallwood the certificates representing the HRP units, which CPA was holding as collateral for both the New Note and CPA's contingent participatory interest. The to-be-canceled New Note (a copy of which was attached to Mr. Koenig's letter) also specifically referred to "the performance by [Hallwood] of any of the other obligations of this Note *or the Pledge Agreement*." [5]

After hearing nothing from CPA for three weeks, Mr. Koenig telephoned Mr. Mohl in mid-August, 1996, to inquire if CPA intended to respond to his July 23rd proposal. Mr. Mohl told Mr. Koenig that CPA had agreed to the proposal and that he (Mohl) would execute the July 23, 1996 letter and return it to Hallwood. Mr. Mohl first sent the letter to CPA's outside counsel, the law firm of Reed, Smith, Shaw & McClay ("Reed Smith"). After consulting with Reed Smith, on August 21, 1996 Mr. Mohl executed the letter (hereinafter, the "Letter Agreement") and delivered it by fax to Hallwood. Thereafter, on August 26, 1996, Kimberly Dussol of CPA gave Mr. Koenig wiring instructions for Hallwood to prepay the New Note. She also asked Mr. Koenig to tell her when a Hallwood representative would be arriving at Carey to retrieve the New Note and the HRP units CPA was holding.

When Hallwood's representative arrived at CPA, however, CPA repudiated the Letter Agreement and refused to surrender the HRP units. When Mr. Koenig asked why, Ms. Dussol referred Mr. Koenig to CPA's counsel, Reed Smith. Mr. Koenig next met with Ruth Perfido, a Reed Smith attorney, who asked Mr. Koenig if the Letter Agreement contemplated a full release of Hallwood's obligations, including the participatory interest. Mr. Koenig said "absolutely, that was our deal with Anthony Mohl." [6] Ms. Perfido responded that in that case she did not think that Carey would proceed with the transaction. Mr. Koenig replied that Hallwood wanted to proceed with the transaction and believed it had a valid contract [7]

The end result was that the transaction did not close.[8] On April 16, 1997, CPA filed this action, claiming that Hallwood had procured the Letter Agreement inequitably and in breach of the Settlement Agreement. Hallwood filed a counterclaim seeking specific enforcement of the Letter Agreement. Under a reservation of rights and to avoid being in default, Hallwood continued making interest payments under the New Note during the pendency of this action. Thereafter, Hallwood sought to redeem the HRP units, but CPA refused to surrender them. Accordingly, on December 16, 1999, on Hallwood's motion, this Court issued an Order under which (i) Hallwood paid the $500,000 principal amount plus $83,210 accrued interest directly to CPA, and (ii) Hallwood paid $900,000 (representing the maximum participatory interest obligation plus $400,000 for possible attorneys fees and costs) into an escrow account, where those funds remain. In exchange for the foregoing, (iii) CPA surrendered to Hallwood for redemp-

---

5. Attachment to JX 5, at 2 (emphasis added).

6. Trial Transcript ("Tr.") at 22.

7. According to Mr. Koenig, Ms. Perfido then responded "well, that may be valid, but there will be some expensive litigation to resolve that matter." Tr. at 23.

8. Initially, Hallwood filed an action to enforce the Letter Agreement against CPA in the United States District Court for the Southern District of New York. After CPA moved to dismiss the case on jurisdictional grounds, the parties stipulated to the dismissal of that action.

tion the HRP units that CPA had been holding as collateral.[9]

## II. THE CONTENTIONS

Under the Settlement Agreement, Hallwood owed three separate obligations to CPA. The first two, which were evidenced by the New Note, were the obligations to pay CPA the principal amount of $500,000 on the maturity date and to pay 8% interest each quarter during the term of the Note. The third obligation, evidenced by the Settlement Agreement and the Security Agreement, was to pay to CPA, on the maturity date, 25% of the increase in value of the HRP units, up to a maximum of $500,000.

The parties agree that the Letter Agreement, and Hallwood's performance thereunder after this lawsuit was filed, extinguished the first two of those obligations. The dispute concerns only the third—Hallwood's obligation to pay CPA its contingent participatory interest, then worth $500,000, in the HRP units. Thus, at stake in this litigation is the contingent participatory interest to which CPA would be entitled but for the release contained in the August 21, 1996 Letter Agreement. If that Letter Agreement constitutes a legally valid general release by CPA as Hallwood contends, then CPA is not entitled to that participatory interest. But if, as CPA argues, the Letter Agreement is not legally valid, or (even if legally valid) nonetheless does not operate as a general release

that extinguishes this specific obligation, then CPA would be entitled to judgment for the $500,000 value of the contingent participatory interest. Accordingly, the focus of the parties' legal dispute is the contractual validity of the August 21, 1996 Letter Agreement and of its release language. CPA, as plaintiff, contends that the Letter Agreement is not a valid enforceable contract for three separate reasons.[10] The first is that Hallwood procured that Agreement in violation of the notice provision of the 1994 Settlement Agreement, which pertinently provided that "all notices, demands, directions, and other communications" under the provisions of that Agreement must be in writing and delivered to CPA at "c/o W.P. Carey & Co., Inc., 620 Fifth Avenue, New York, New York 10020, Attention: H. Cabot Lodge, III, with a copy to Reed Smith Shaw & McClay, 2500 One Liberty Place, 1650 Market Street, Philadelphia, Pennsylvania 19103, Attention: Ben Burke Howell, Esq." [11] CPA contends that the August 21, 1996 Letter Agreement was negotiated in violation of this notice provision, because that Agreement, and the communications relating thereto, were addressed to Mr. Mohl, rather than to Mr. Lodge and to Reed Smith as the notice provision required. On this basis alone, CPA urges, the Letter Agreement is invalid and unenforceable. Hallwood strongly disagrees, for four distinct reasons. Hallwood contends that (1) the notice provision is inapplicable; [12] (2) even if that provision is

9. The intent underlying this escrow arrangement is that if the Court enters judgment for Hallwood, the escrowed funds would be returned to Hallwood, and if the Court enters judgment in CPA's favor, the judgment would be paid from those escrowed funds, with the remainder (if any) being returned to Hallwood.

10. The claims addressed in this Opinion are those set forth in the parties' post-trial briefs.

To the extent the parties raised in their pre-trial briefs other claims that they did not press in their post-trial briefs, those claims are deemed to have been abandoned.

11. JX 3, § 10(a).

12. In addressing this claim, I assume, without deciding, that the notice provision is applicable to the parties' communications leading up to the execution of the Letter Agreement. Ob-

applicable, it was not breached; (3) in any event, CPA waived its rights under that provision and also is estopped from relying on it; and (4) the notice provision was modified by the parties' oral communications and course of conduct.

CPA's second claim is that even if the notice provision of the Settlement Agreement was not violated, the August 21, 1996 Letter Agreement is invalid and unenforceable because it was procured in violation of Hallwood's implied duty of good faith and fair dealing. The gist of that claim is that (i) Mr. Mohl never understood that the Letter Agreement would constitute a general release of all of Hallwood's obligations to CPA and (ii) Hallwood created, and then attempted to capitalize on, Mr. Mohl's misunderstanding by procuring Mr. Mohl's signature on an agreement that Mr. Mohl mistakenly believed included only a limited release.

Hallwood vigorously disputes this claim as well. Hallwood contends that its representatives acted in good faith at all times, and had no reason to suspect that Mr. Mohl misapprehended any material term of the Letter Agreement. In fact, Hallwood argues, Mr. Mohl and CPA were aware of the participatory interest, and they had to be aware that the Letter Agreement would release CPA's contractual claim to that interest. Indeed, Mr. Koenig believed that Mr. Mohl signed the Letter Agreement to ensure that CPA would receive early and certain repayment of the New note from a financially troubled Hallwood, and that CPA was willing to accept a steep discount because of the contingent nature of the participatory interest and the price risk that was inherent in the HRP units.

Third, CPA argues that even if the August 21, 1996 Letter Agreement is valid, in

any event it is not an enforceable general release because the scope of the release is unclear. Specifically, CPA urges, the Letter Agreement does not state that it operates as a general release, and it does not mention or refer to the contingent participatory interest, even though the Letter Agreement does reference and attach a copy of the New Note. That lack of clarity is significant, CPA urges, because in fact Mr. Mohl did not understand that by executing the Letter Agreement, CPA would be releasing its claim to the contingent participatory interest.

To this argument Hallwood responds that the release contained in the Letter Agreement is clear and unambiguous, and that if there was any misunderstanding of CPA as to the scope of the release, it was a unilateral mistake that Hallwood played no role in causing. Therefore, Hallwood argues, that misunderstanding does not afford CPA a basis to avoid the Letter Agreement.

These colliding contentions present three sets of issues: (1) Was the notice provision of the Settlement violated and if so, does that violation legally vitiate the Letter Agreement? (2) Did Hallwood procure the Letter Agreement in breach of its implied duty of good faith and fair dealing? and (3) Does the release language of the Letter Agreement, fairly read, constitute a general release that would encompass CPA's claim to a contingent participatory interest in the HRP units? These issues are next addressed in Part III.

### III. ANALYSIS

**A. Whether Hallwood Breached The Notice Provision**

■ CPA's primary claim is that the Letter Agreement is invalid because Hall-

viously, if the notice provision is inapplicable, CPA's first claim would fail for lack of a valid

premise.

wood's representatives negotiated it in violation of the notice provision of the January, 1994 Settlement Agreement. The full text of the notice provision, which appears as subsection (a) of Section 10, entitled "Miscellaneous," is set forth as follows:

All notices, requests, demands, directions, and other communications given to or made upon any party hereto under the provisions of this Agreement shall be in writing unless otherwise permitted hereunder and shall be delivered or sent by telecopier confirmed by hard copy, or by overnight courier, in all cases with postage prepaid, to the applicable party, addressed, if to owners, at c/o W.P. Carey & Co., Inc., 620 Fifth Avenue, New York, New York, 10020, Attention: H. Cabot Lodge, III, with a copy to Reed Smith Shaw & McClay, 2500 One Liberty Place, 1650 Market Street, Philadelphia, Pennsylvania 19103, Attention: Ben Burke Howell, Esquire, and if to Hallwood, 3710 Rawlins, Suite 1500, Dallas, TX 75219, Attention: President, with a copy to Robert C. Feldman, Esquire, Weil Gotshal & Manges, 100 Crescent Court, Suite 1300, Dallas, TX 75201, or in accordance with any unrevoked written direction from any party to the other parties hereto. Except as otherwise expressly provided herein, any properly given notice hereunder shall be effective when sent.[13]

CPA's argument, simply stated, is that the notice provision requires that "all ... communications given to or made upon any party hereto under the provisions of [the Settlement] Agreement" be directed in writing to the four individuals specified above. Because neither Mr. Koenig nor anyone else at Hallwood ever directed the Letter Agreement to CPA, care of Mr. Lodge with a copy to Mr. Howell, Hall-

wood breached the Settlement Agreement's notice provision.

This argument is infirm, both legally and factually. Legally, the argument founders because the notice provision does not specify any consequence, adverse or otherwise, of a failure to abide by that provision's literal terms. Specifically, nowhere does the Settlement Agreement provide that a failure to conform to the literal requirements of the notice provision will invalidate any legal obligation of CPA resulting from the nonconforming communication. Moreover, CPA cites no case authority supporting that result.

The claim also fails factually, because there is no extrinsic record evidence that the parties intended that a violation of the notice provision would have that consequence.

First, literal compliance with that provision would have been impossible, because by the time the Letter Agreement was negotiated, Mr. Lodge had left the Carey organization. Moreover, CPA's own conduct suggests that it did not regard the notice provision as requiring literal compliance. When communicating with Hallwood about a 1:5 split of HRP units in 1995 before the Letter Agreement was even proposed, CPA's Ann Marie Luongo contacted Mr. Koenig, Hallwood's Treasurer and Controller, not Hallwood's President or Mr. Feldman of Weil, Gotshal & Manges, as the notice provision directed.[14]

Second, there is no evidence that CPA ever objected to Mr. Koenig corresponding with Mr. Kehoe about the New Note. Indeed, Mr. Koenig testified that his correspondence with Carey was always through Mr. Kehoe, and that he believed Mr. Lodge (before he departed Carey) had di-

---

**13.** JX 3, § 10(a).

**14.** DX 6.

rected him to proceed in that fashion.[15] Consistent with that practice, when CPA communicated with Hallwood about the Letter Agreement (including delivering instructions for wiring funds for the prepayment of the New Note), CPA again directed its correspondence to Mr. Koenig, not to Hallwood's President or to Mr. Feldman of Weil, Gotshal.[16] Thus, CPA's own conduct undercuts its claim that anything less than literal compliance with the notice provision invalidates any action taken thereunder.

The record persuades me that the parties, by their conduct, intended that substantial compliance with the notice provision would suffice. Clearly, Hallwood substantially complied with the notice provision. That provision does *not* require that correspondence be sent directly to Mr. Lodge and Mr. Howell. What it requires is that communications be directed to *CPA* care of Carey, attention: H. Cabot Lodge, III, with a copy to Reed Smith, attention: Ben Burke Howell, Esquire. A logical inference, strengthened by the parties' actual conduct, is that the notice provision was intended to ensure that responsible executives of CPA, as well as CPA's attorneys, received communications sent pursuant to Section 10. That intent was carried out here. As earlier noted, Mr. Koenig could not have sent the Letter Agreement to Mr. Lodge on July 23, 1996, since Mr. Lodge had already left the Carey organization. Believing that Mr. Lodge had instructed him to communicate with CPA through Mr. Kehoe, Mr. Koenig contacted Mr. Kehoe, who in turn instructed Koenig to negotiate the Letter

Agreement with Mr. Mohl, CPA's First Vice President. Mr. Mohl, in turn, communicated with CPA's attorneys, Reed Smith, before executing the Letter Agreement and delivering it to Hallwood.

Because Hallwood sent the Letter Agreement to a high level CPA executive, and the Letter Agreement was reviewed by Reed Smith, CPA's attorneys, the underlying purpose of the notice provision was carried out. I therefore conclude that Hallwood, substantially and to the extent reasonably practicable, complied with the notice provision of the Settlement Agreement, and did not breach it.[17] The Court therefore rejects CPA's claim that the Letter Agreement is invalid because it was negotiated in violation of the notice provision.

## B. Whether Hallwood Breached Its Implied Covenant of Good Faith and Fair Dealing

### 1. CPA's Claim Summarized

■ CPA's second claim is that the Letter Agreement is invalid because in procuring CPA's assent to it, Hallwood violated its implied duty to perform the Settlement Agreement in good faith.

The factual premise of this claim is CPA's contention that Mr. Mohl never understood that he was being asked to agree to a general release of Hallwood's obligations to CPA, including specifically CPA's participatory interest. Rather, Mohl believed (and testified) that all he was discussing and negotiating was an early payoff of the New Note. CPA urges that

---

15. Tr. at 24.

16. JX 1; DX 5.

17. Because I find that Hallwood did not breach the notice provision, I do not reach Hallwood's remaining arguments, *i.e.*, that CPA is barred from asserting its notice provi-

sion claim under the doctrines of waiver and equitable estoppel, and that even if literal compliance with the notice provision was originally intended, the parties modified that provision (thereby changing their intent) by their later conduct.

Mr. Mohl's testimony must be credited, because at no time during Mr. Koenig's discussions with Mr. Mohl did Koenig ever mention the participatory interest, nor did Mr. Mohl ever raise that subject with Mr. Koenig.[18]

Starting from that premise, CPA then asserts that Hallwood "created, perpetuated and attempted to capitalize"[19] on Mr. Mohl's misunderstanding by not disclosing to Mr. Mohl, or anyone else at CPA, Hallwood's position that by assenting to the Letter Agreement, CPA would be releasing its claim to the participatory interest. Because that interest was then worth $500,000, its release would represent a 50% discount of Hallwood's total obligation to CPA.

As evidentiary support for this argument, CPA points to the following: (i) Hallwood's internal deliberations regarding the payoff of the New Note (which included an internal memorandum calculating the participatory interest) focused on the participatory interest, yet during the negotiations Hallwood never mentioned the participatory interest to CPA; (ii) similarly, Hallwood drafted the Letter Agreement without making any explicit reference to the participatory interest; (iii) although Hallwood attached a copy of the New Note as an exhibit to the Letter Agreement, it did not similarly attach a copy of the Settlement Agreement or the Security Agreement; (iv) although Messrs.

Koenig and Melle expected CPA to make a counteroffer (due to the size of the discount being proposed) and were surprised when no counteroffer was made,[20] Hallwood never attempted to confirm the terms of the deal (specifically, its general release component) or to inquire further into CPA's understanding of those terms. Had Hallwood done that (CPA argues), Hallwood would have learned that there was no agreement on that point, evidenced by the fact that when Mr. Koenig first discussed the participatory interest with a representative of CPA (Ms. Perfido of Reed Smith), CPA immediately repudiated the Letter Agreement.

### 2. The Applicable Legal Principles

■　■　The legal principles that apply to this dispute are not contested. Under Delaware law[21] an implied duty of good faith and fair dealing inheres in every contract.[22] That implied covenant is "a judicial convention designed to protect the spirit of an agreement when, without violating an express term of the agreement, one side uses oppressive or underhanded tactics to deny the other side the fruits of the parties' bargain."[23] This doctrine emphasizes "faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." '[24] The implied covenant will arise, however, "only where it is *clear* from what the parties expressly agreed, that they would

---

18. Tr. at 30; Koenig Dep. at 94, 96–97, 101.

19. Pl. Opening Post-trial Br. at 11.

20. Tr. at 31–32, 51.

21. Both the New Note and the Settlement Agreement provide that those instruments will be governed by the law of the State of Delaware.

22. *Merrill v. Crothall–American, Inc.,* 606 A.2d 96, 101 (Del.1992).

23. *Chamison v. Healthtrust, Inc.—Hosp. Co.,* 735 A.2d 912, 920 (Del.Ch.1999) (citing *Gilbert v. El Paso Co.,* 490 A.2d 1050, 1055 (Del.Ch.1984) and *Restatement (Second) of Contracts* § 205 (1981)).

24. *Continental Ins. Co. v. Rutledge & Co.,* 750 A.2d 1219, 1234 (Del.Ch.2000) (quoting *E.I. duPont de Nemours & Co. v. Pressman,* 679 A.2d 436, 443 (Del.Supr.1996)).

have proscribed the challenged conduct as a breach of [their agreement] had they thought to negotiate with respect to the matter."[25] To prove a breach of the implied covenant of good faith and fair dealing, the claimant must also demonstrate that the conduct at issue involved "an aspect of fraud, deceit or misrepresentation."[26] Given this burden and the restrictions upon the applicability of the doctrine, cases in which the implied covenant of good faith and fair dealing is successfully invoked "should be rare and fact-intensive, turning on issues of compelling fairness."[27] These stringent proof requirements reflect a judicial recognition that it is generally "not the proper role of a court to rewrite or supply omitted provisions to a written agreement," and that "implying obligations based on the covenant of good faith and fair dealing is a cautious enterprise."[28]

The question is whether CPA has shown that this is one of those "rare" cases that warrants implicating the implied covenant of good faith and fair dealing. For the reasons next discussed, the answer is no.

### 3. The Infirmities of CPA's Implied Covenant Claim

*First*, CPA has failed to establish the essential factual premise of its claim, namely, that Mr. Mohl did not know the Letter Agreement contained a general release that would extinguish CPA's contingent participatory interest in the HRP units that CPA was holding as collateral. The record indicates that both CPA and

Mr. Mohl were aware of the participatory interest, and that Hallwood had no reason to believe that Mr. Mohl or CPA understood the Letter Agreement as involving anything less than a general release.

The only direct evidence of Mr. Mohl's asserted belief that the Letter Agreement released only Hallwood's obligation under the New Note but not the contingent participatory interest, is Mr. Mohl's deposition testimony, which was submitted (without objection) in lieu of Mr. Mohl appearing as a live witness at the trial.[29] That deposition testimony, however, is conclusory and given Mr. Mohl's executive position with CPA and Carey, is unavoidably self-serving. Although it may be the fact that Mr. Mohl believed that he was negotiating only a limited release of the obligation under the New Note, CPA did not produce Mr. Mohl as a witness at the trial. That decision deprived the parties and the Court of the opportunity to test the fact and the reasonableness of Mr. Mohl's claimed belief.

CPA's decision not to produce Mr. Mohl as a live witness is significant, because there are facts of record that show the implausibility of Mr. Mohl's asserted belief that the Letter Agreement did not include a general release of all of CPA's claims. First, Mr. Mohl was not unsophisticated. He was a Senior Vice President of CPA and Carey, he held an MBA from Columbia University, and had an accounting and finance background. Second, the Letter

**25.** *Dave Greytak Enterprises v. Mazda Motors of America, Inc.*, 622 A.2d 14, 22–23 (Del.Ch. 1992) (emphasis added); *Cincinnati SMSA Ltd. v. Cincinnati Bell Cellular Sys. Co.*, 708 A.2d 989, 992 (Del.Supr.1998) (quoting *Katz v. Oak Industries, Inc.*, 508 A.2d 873, 880 (Del.Ch.1986)); *DuPont v. Pressman*, 679 A.2d at 443 (explaining that the court's inquiry should focus on "what the parties likely would have done had they considered the issue involved").

**26.** *Merrill v. Crothall–American, Inc.*, 606 A.2d at 101.

**27.** *Cincinnati SMSA Ltd.*, 708 A.2d at 992.

**28.** *Id.*

**29.** Mohl Dep. at 24–25.

Agreement expressly stated that "[a]fter repayment of the Note, Hallwood would have no further obligation to the Payees." Third, before signing the Letter Agreement Mr. Mohl submitted it to Reed Smith, CPA's outside counsel, for their review. Even if, despite his sophistication, Mr. Mohl was incapable of understanding the meaning of the quoted language, CPA's attorneys clearly were capable. Assuming (as I must) that Reed Smith discharged its professional duties competently, it is reasonable to infer that that firm advised Mr. Mohl of the true legal import of the contract he was being asked to sign. There is no evidence, apart from Mr. Mohl's cursory and conclusory deposition testimony, which rebuts that inference.

CPA's argument is also unpersuasive because it was a party to, and had possession of, the Settlement Agreement. Mr. Kehoe, with whom Mr. Koenig had a course of dealing, was aware of the participatory interest and directed Mr. Koenig to negotiate with Mr. Mohl. It is implausible that Mr. Kehoe would have instructed Mr. Koenig to deal with a CPA representative who was ignorant of CPA's interests, both as a Hallwood creditor under the New Note and as a holder of a contingent participatory interest in a Hallwood affiliate's partnership units that secured the Note.

For these reasons, CPA has failed to persuade me that Mr. Mohl was ignorant of, or misunderstood, the material terms and the import of the Letter Agreement that Mr. Koenig and he were negotiating.[30]

*Second,* even if Mr. Mohl did misunderstand the nature and import of the Agreement, there is no persuasive evidence that

Mr. Koenig or anyone else at Hallwood knew or had reason to know that "fact." CPA emphasizes that the letter Agreement proposal represented a 50% discount from Hallwood's total obligation to CPA, and that Koenig admittedly was surprised that CPA accepted the proposal without making any counteroffer. That fact, CPA argues, supports its claim that Mr. Mohl must have misapprehended the scope of the release to which CPA was being asked to agree; otherwise, CPA would have made a counteroffer or rejected the proposal outright.

To be sure, one could draw that inference from CPA's acceptance of Hallwood's proposal without making a counteroffer. The difficulty with CPA's argument, however is that as a matter of pure logic, the same facts from which CPA draws that inference also support the opposite inference; *i.e.,* that Mr. Mohl *did* understand the import of the Letter Agreement and, at the time the Agreement was signed, found it acceptable. The question is: as between these two contradictory inferences, which is the more persuasive? The record evidence, in my view, significantly favors the inference that Mohl—and CPA—were not laboring under a misunderstanding.

Although Mr. Koenig was surprised not to receive a counteroffer from CPA, he testified that he had no reason to suspect that Mr. Mohl was ignorant of CPA's participatory interest or any other material term of the agreements between the parties. Rather, Mr. Koenig believed that given Hallwood's recent rocky financial history and the uncertainty of what the

---

30. To reiterate, there may have been a logical explanation for these circumstances that appear to render Mr. Mohl's testimony implausible. But, that explanation would have had to come from Mr. Mohl's live testimony at the trial. By not producing Mr. Mohl as a trial witness, CPA assumed the risk that his deposition testimony would not be accepted at face value. Hallwood avoided that risk by producing Messrs. Koenig and Melle to testify live at the trial. The testimony of those two witnesses I find to be credible.

value of the HRP units might be 19 months in the future, to avoid a greater financial risk CPA, after three weeks of deliberation, had made a business decision to accept immediate and certain repayment of a lesser amount, even at a sizeable discount.[31] That scenario is at least as plausible as the one served up by CPA, and when considered in combination with the other facts earlier discussed, Hallwood's scenario is the more persuasive.

The difficulty with CPA's scenario is that it implicitly assumes that Mr. Mohl was the only relevant actor and that only his state of mind is pertinent. That assumption ignores the fact that before signing the Letter Agreement, Mr. Mohl submitted it to Reed Smith for its independent review. Given the intervention of legal counsel, CPA's "mistake" scenario hangs together only if one supposes that Reed Smith also misapprehended the nature and breadth of the release embodied in the Letter Agreement. CPA has not advanced, let alone proved, any such claim.

CPA's scenario also ignores other circumstances that minimized, if not eliminated, any reason for Mr. Koenig to question Mr. Mohl's understanding of the release. CPA was a party to, and possessed copies of, the Settlement Agreement. That fact entitled Koenig to assume that CPA was aware of that Agreement's terms, including the participatory interest. CPA's Mr. Kehoe was clearly aware of CPA's participatory interest, and it was Mr. Kehoe who directed Mr. Koenig to negotiate with Mr. Mohl.

For these reasons, CPA has failed to persuade the Court that Hallwood was aware that Mr. Mohl was ignorant of, or misunderstood the nature and effect of, the release embodied in the Letter Agreement.

*Third,* even if it is assumed that Mr. Mohl and CPA were ignorant of the scope of the release being granted, CPA has not shown that Hallwood "capitalized" upon that ignorance, or otherwise engaged in conduct that involved "an aspect of fraud, deceit, or misrepresentation." CPA does not even claim that Hallwood committed a fraud or misrepresentation. At most, CPA contends (and even then only obliquely) that Hallwood engaged in a form of deceit, by attempting in various ways to conceal from CPA the fact that the Letter Agreement would extinguish Hallwood's obligations under the participatory interest arrangement as well as under the New Note. In particular, CPA emphasizes that (i) Hallwood never explicitly raised the subject of the participatory interest in the settlement negotiations or in the Letter Agreement, and that (ii) Hallwood attached to the Letter Agreement a copy of the New Note but not a copy of the Settlement Agreement or the Security Agreement. None of these arguments, in my view, rises to the level of culpable conduct needed to invoke the implied covenant of good faith.

The fact that the subject of the participatory interest did not come up explicitly in the negotiations does not, without more, establish that Hallwood was deceitful. That is particularly true where, as here, (i) CPA had all of the relevant documents in its possession and Hallwood believed that CPA knew their material terms, and (ii) there is no evidence of any affirmative effort by Hallwood to conceal any material facts. Moreover, that Hallwood attached a copy of the New Note, but not the Settlement Agreement, to the Letter Agreement does not establish deceit either. There was no reason for Hallwood to attach the

---

**31.** Tr. at 20–21, 31–32, 35.

Settlement Agreement or the Security Agreement to the Letter Agreement, but Hallwood did have a reason to attach the New Note. The New Note, unlike the other agreements, had to be canceled and returned to Hallwood so that it would no longer be negotiable. By attaching a copy of the New Note, Koenig would assure that the correct instrument would be canceled.

If Hallwood was seeking to conceal the releasing effect of the Letter Agreement upon the contingent participatory interest, Hallwood chose a most ineffectual way to do that. The New Note (which was attached to the Letter Agreement) makes several references to the Security Agreement, which, in turn refers to the Settlement Agreement and to CPA's participatory interest.[32] CPA also fails to explain why, if Hallwood was deliberately seeking to conceal the existence or involvement of the participatory interest in this transaction from Mr. Mohl, Mr. Koenig "copied" Mr. Kehoe on the Letter Agreement. Mr. Kehoe knew of CPA's participatory interest. To show Kehoe as the recipient of a copy would risk inviting Mr. Mohl to discuss with Mr. Kehoe the very subject that Hallwood was supposedly trying to conceal—the release of CPA's participatory interest.

I conclude, for these reasons, that CPA has failed to establish that Hallwood engaged in conduct that was deceitful or in any other way inequitable to CPA. Even if Mr. Mohl and CPA were mistaken in their belief that the Letter Agreement would not release the participatory interest, it was through no demonstrated fault of Hallwood.

 *Fourth,* assuming again that Mr. Mohl and CPA were unaware that the Letter Agreement would extinguish CPA's contingent participatory interest, in the absence of fraud or deception their mistake cannot, as a legal matter, afford CPA a basis to avoid the Letter Agreement. Importantly, Mr. Mohl did not testify that he mistakenly signed the Letter Agreement because he was unaware of the participatory interest. Rather, he claimed that his mistake was signing a release that was broader than he had understood it to be.[33] To the extent CPA's position is that Mr. Mohl knew of CPA's participatory interest but did not realize that the Letter Agreement would extinguish it, that is insufficient to avoid the Letter Agreement. "[A]bsent a showing of fraud or deception, a release cannot be avoided merely on the ground that the releasor made a 'mistake of law' with respect to the legal significance of signing a release or that the releasor failed to read the release or to comprehend its contents."[34]

 *Fifth,* and finally, CPA has failed to establish another indispensable condition for invoking the implied covenant of good faith—the absence of an express term that the parties, had they considered the subject, would have included in their agreement. Where the subject at issue is expressly covered in the parties' contract, the implied duty to perform in good faith does not come into play.[35] In this case the

**32.** JX 5 at Bates Nos. CPA 32–34; JX 3 at Bates Nos. CPA 16–19.

**33.** Mohl Dep. at 24–25.

**34.** *Wright v. United States,* 427 F.Supp. 726, 729 n. 10 (D.Del.1977); *accord Hicks v. Soroka,* 188 A.2d 133, 138–40 (Del.Super.1963); *see also Judge Trucking, Inc. v. Estate of Coo-*

*per,* C.A. No. 92C–03–041, 1994 WL 680039, at **4–5, Graves, J. (Del.Super.Ct., Sept. 29, 1994).

**35.** *Dave Greytak Enterprises, Inc. v. Mazda Motors of America, Inc.,* 622 A.2d, 14, 23 (Del.Ch.1992).

subject at issue—a general release of all of Hallwood's obligations—was explicitly addressed in the Letter Agreement, which states that "[a]fter repayment of the Note, Hallwood will have no further obligation to the Payee." Although CPA might properly argue that that language is insufficiently specific to constitute a general release,[36] CPA cannot seriously argue that the subject matter (a release of claims) was not addressed in the contract, for assuredly it was.

CPA's implied covenant of good faith claim is, accordingly, rejected.

## C. The Letter Agreement Is An Enforceable General Release

■ CPA's third, and final, claim is that even if the Letter Agreement is a valid contract, it does not constitute an enforceable general release, because the release language is ambiguous and the balance of the Letter Agreement is too unspecific. Specifically, CPA argues that the Letter Agreement "when scrutinized for clarity and scope hardly suffices as a general release" because (i) that Agreement "mentions two of three obligations it intended to extinguish, the New Note and accompanying interest, but makes no mention of the third—the Participatory Interest;" (ii) "the purported general release language . . . appears only once, hidden in a list of payoff procedures on the second page of the letter;" (iii) the Letter Agreement "does not employ the term 'general release,' nor does it reference all of the obligations to which it refers;" and lastly, (iv) the Letter Agreement is not the product of a genuine meeting of the minds.[37]

■ Two of these arguments have no legal foundation or case support, and the rest are factually wrong. The release language plainly states that "[a]fter repayment of the [New] Note, Hallwood will have no further obligation to Payees." CPA argues that the release is ambiguous since it does not employ the term "general release" and does not reference each and all of the obligations it is intended to encompass. But, CPA cites no case that supports its apparent proposition that the release must recite the words "general release." To the contrary, courts do enforce releases that extinguish all obligations owed to the releasor without using the words "general release." [38] Nor is there any requirement that the release specifically identify each and all of the obligations it extinguishes. A general release is one that extinguishes all claims owed by the released party to the releasor, including even claims that one or both parties did not have in mind at the time the release was executed. A release that identifies each of the to-be-extinguished claims is (absent language evidencing an intent to release all claims) a limited or

---

36. Indeed, that argument is the basis of CPA's third (and final) claim of invalidity.

37. Pl. Opening Post-trial Br. at 13–14. This claim, which is the last one argued in CPA's Brief, occupies less than two pages and has every appearance of a "throwaway" argument.

38. *See, e.g., Hob Tea Room, Inc. v. Miller,* 89 A.2d 851, 856–57 (Del.1952); *accord Pratt Plumbing and Heating, Inc. v. Mastropole,* 68 A.D.2d 973, 414 N.Y.S.2d 783, 784–85 (N.Y.A.D., 3 Dept., 1979) (noting that no particular form need be used in drafting a release, and holding that letter stating it would hold husband "solely responsible" for cost of project effectively released wife); *see also Banca Commerciale Italiana, New York Branch v. Northern Trust Int'l Banking Corp.,* 160 F.3d 90, 95–96 (2d Cir.1998); *Marvel Entertainment Group, Inc. v. Young Astronaut Council,* 747 F.Supp. 945, 948 (S.D.N.Y.1990) ("Modification Agreement" between trademark holder and licensee providing that neither party shall have any further obligations under either contract constitutes release).

specific release, not a general release. Thus, in *Hob Tea Room v. Miller*, the Supreme Court rejected the argument that a general release could not bar a claim that neither party had in mind at the time of the release. Holding that a general release bars all claims by the releasing party, the Court observed that:

> a general release ... [is] one which is intended to cover everything—what the parties presently have in mind, as well as what they do not have in mind, but what may, nevertheless, arise. Such general releases are in common use, and their potency, if it renders them too dangerous for careless handling, is at the same time a constant boon to business and courts. Their validity is unchallenged.[39]

Here, as in *Hob Tea Room*, the release in the Letter Agreement, unequivocally and in global terms, extinguished all obligations that Hallwood owed to CPA, regardless of whether Mr. Mohl had any particular obligation in mind at the time he signed the Agreement.

CPA's remaining arguments are similarly lacking in merit. CPA argues that the release language "appears only once, hidden in a list of payoff procedures on the second page of the letter." But, the letter is only two pages long, and the release language is not in any sense "hidden" or buried in other text. Only by failing to read the second page could one miss the release.

Lastly, CPA argues that the Letter Agreement is not an enforceable general release, because Messrs. Mohl and Kehoe had no meeting of the minds on that point. This argument, however, is premised on the already-rejected argument that Mr. Mohl misunderstood the scope of the release. The Court has found that CPA has not met its burden of proof on that issue; moreover, even if Mr. Mohl's understanding was incorrect, CPA has not claimed or shown that its attorneys, Reed Smith, labored under a similar misunderstanding.

****

Before concluding, a brief postscript is appropriate, if only to dispel any impression that this case was a simple one to decide. It was not. In deciding the merits of a legal dispute, it is important to reach a result that is consistent with the truth of the case, as best as the judge can ascertain it. Here, the Court is able to glean what the truth of the case is *not*, but cannot determine what it *is*.

This case is problematic because it involves the release by a sophisticated party of a claim—at the time worth $500,000—that represented a 50% discount on the larger obligation being settled. In different circumstances that result might justify an argument that the Letter Agreement is void on grounds of unconscionability. That claim is not available here, however, because the Letter Agreement is not a contract of cohesion and there was no imbalance in the parties' relative bargaining strength.

The question, then, is: why would a sophisticated party such as CPA make this bargain unless it was deceived into doing so? The force of that question prompted the Court to scrutinize the record carefully to determine whether that is, in fact, what happened. If it did, then the Court would surely have avoided the Letter Agreement. But CPA's deception and other contract-avoidance arguments were weak and the Court's scrutiny revealed no persuasive evidence of wrongdoing. That makes the case even more problematic, because if inequitable conduct is not the explanation,

---

**39.** 89 A.2d at 856.

then what is? To that question the record provides no direct answer. The only answer that arguably makes sense (but which may or may not be correct) can only be arrived at logically by process of elimination.

The only explanation that makes sense and seems consistent with the known facts is that at the time the Letter Agreement was signed, Mr. Mohl and Reed Smith knew that it would operate as a general release of all claims, but made the considered business judgment to sign it. Before the transaction closed, however, Mohl's decision was countermanded by a higher-ranking CPA executive who learned of the Letter Agreement and concluded that it was a bad business bargain. Given that decision from a high level executive, but faced with a contract that already had been duly authorized and signed, CPA's counsel had little to work with except to make the arguments they advanced here. Whether or not this is what in fact occurred, of course no one but CPA will ever know.

The critical point is that the Letter Agreement—negotiated in an arms' length commercial setting and signed by a duly authorized CPA representative—became legally binding before it was repudiated. On a human level, CPA's frustration over having to perform an agreement that grants a discount possibly worth $500,000 is understandable. From a legal standpoint, however, that alone cannot carry the day. The other party to the contract bargained for it at arms' length and in good faith. Absent demonstrated wrongdoing or some different legal basis for avoidance, the law does not excuse performance. Therefore, the bargain embodied in the Letter Agreement, even if economically unwise from the standpoint of CPA, must be allowed to stand.

## IV. CONCLUSION

For the reasons set forth above, judgment will be entered in favor of Hallwood, and against CPA, on CPA's claims and on Hallwood's counterclaims. Counsel shall confer and submit an appropriate form of implementing order.