**PUBLISH**

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**NOV 2 2004**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

CASSANDRA O'TOOL; JOHN O'TOOL,

    Plaintiffs,

and

HORIZON HOLDINGS, LLC, formerly known as Horizon Marine LC; GEOFFREY PEPPER,

    Plaintiffs-Appellees-Cross-Appellants,

v.

GENMAR HOLDINGS, INC.; GENMAR INDUSTRIES, INC.; GENMAR MANUFACTURING OF KANSAS, INC., formerly known as Genmar Manufacturing of Kansas, LLC,

    Defendants-Appellants-Cross-Appellees.

No. 03-3094

No. 03-3095

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D.C. No. 01-CV-2193-JWL)**

---

Eric J. Magnuson, Rider Bennett, LLP, Minneapolis, Minnesota, (Timothy K. McNamara, Alok Ahuja, Tedrick A. Housh, Lathrop & Gage L.C., Kansas City, Missouri, with him on the briefs), for the defendants-appellants-cross-appellees.

George A. Hanson (Todd M. McGuire with him on the briefs), Stueve Helder Siegel LLP, Kansas City, Missouri, for the plaintiffs-appellees-cross-appellants.

Before **EBEL**, **BRISCOE**, and **TYMKOVICH**, Circuit Judges.

**BRISCOE**, Circuit Judge.

Defendants Genmar Holdings, Inc., Genmar Industries, Inc., and Genmar Manufacturing of Kansas, Inc., appeal a jury verdict in favor of plaintiffs Horizon Holdings, LLC (f/k/a Horizon Marine LC) and Geoffrey Pepper on plaintiffs' claim for breach of contract. Plaintiffs cross-appeal, challenging the district court's refusal to award post-judgment interest at a rate set in the underlying contract.[1] We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.

I.

Pepper started working in the recreational boat manufacturing industry in 1977 and he held a variety of engineering and management positions with approximately six different manufacturers between 1977 and 1997. In early 1997, Pepper, his wife, and a group of investors purchased an industrial building in Junction City, Kansas, and formed their own recreational boat manufacturing company, Horizon Marine LC (Horizon). Pepper served as president, and as such was responsible for the overall operations of the company. Pepper's wife Phyllis assumed an administrative role in the business. Pepper's daughter and son-in-law, plaintiffs Cassandra and John O'Tool, were initial investors in

---

[1] The judgments in favor of Cassandra and John O'Tool on their breach of employment contract claims were not appealed.

Horizon. Cassandra served as Horizon's director of human resources, and John oversaw Horizon's manufacturing operations.

Pepper's initial goal was to manufacture and sell aluminum jon boats (a/k/a utility boats) he had designed. He hoped to subsequently expand Horizon's product line to include pontoon and deck boats. Horizon began producing jon boats in October 1997. By early 1998, Horizon had not earned a profit and, in Pepper's words, was "still struggling." Aplt. App. at 1187. Pepper was optimistic, however, that Horizon was making "significant progress" in terms of sales and production, and he believed Horizon would begin earning a profit by the summer of 1998. Id. at 1187-88.

In August 1998, defendants Genmar Holdings, Inc., and Genmar Industries, Inc., (collectively "Genmar") approached Pepper about purchasing Horizon. Genmar, the world's largest recreational boat manufacturer, manufactures approximately eighteen different brands of boats in approximately twelve manufacturing plants throughout the United States. At the time it approached Horizon, Genmar primarily produced "deep V" boats typically used by fishermen in the northern part of the United States. Id. at 2082. Genmar wanted to expand into the southern boat market by producing entry-level, shallow-bottom boats, such as the aluminum jon boats being produced by Horizon. Genmar viewed Horizon as a potential future competitor in the southern boat market and believed that, by purchasing Horizon, it could enter the southern boat market sooner than if it created its own manufacturing facility and boat line.

Negotiations culminated in the sale of Horizon to Genmar in December 1998. Under the terms of the parties' written purchase agreement, Genmar created a new subsidiary, defendant Genmar Manufacturing of Kansas, LLC (GMK), that assumed all of the assets and liabilities of Horizon. GMK also offered written employment agreements to Pepper, who assumed the presidency of GMK, and to Pepper's daughter and son-in-law, both of whom assumed managerial positions with GMK similar to the ones they held with Horizon.

The purchase price paid by Genmar for Horizon was comprised of two components: (1) cash consideration of $2.3 million dollars; and (2) "earn-out consideration." Exh.55 at 3. The purchase agreement detailed how the "earn-out consideration" was to be calculated:

> For a period of five (5) years from and after the Closing, Purchaser agrees to remit to Seller as additional consideration and part of the aggregate Purchase Price hereunder an amount equal to a percentage of all annual gross revenues ("Annual Gross Revenues"), subject to achieving certain gross profit percentages [13% or more in the first year of GMK's operation, and 14% or more thereafter], from the sale of (i) Seller's Horizon (or any direct successor) brand boats, trailers, pre-rigging, parts and accessories (collectively the "Seller Products") and (ii) the manufacture of Purchaser's boats (Genmar Holdings' brands) in Seller's Junction City, Kansas plant facility after the Closing Date, in each case of (i) and (ii) above based upon the annual published dealer list price to a maximum of $5,200,000 (the "Earn-Out Consideration").

Id. at 3-4. At closing, Genmar made an advance payment of $200,000 of earn-out consideration to Horizon, which amount was to be deducted from earn-out consideration payments due to Horizon after the second quarter of 1999.

4

Pepper's understanding of the earn-out provision was that production of Horizon boats and accessories would afford GMK the most potential for achieving gross revenues and in turn maximizing the earn-out consideration. This was because, in addition to receiving a dealer list price for each Horizon boat sold to a dealer, GMK would receive gross revenues for engines, trailers, and other accessories that were sold with the Horizon boats. Pepper was confident he could achieve the maximum earn-out consideration because, in part, Genmar executives had assured him that Horizon boats would "be the champion of th[e] [GMK] facility." Aplt. App. at 1271.

Pepper's expectations and assumptions for GMK's operations were challenged almost immediately after the deal was closed. In early 1999, Pepper was informed by Genmar of a possible trademark conflict with the Horizon brand name[2] and the Horizon brand of boats was renamed "Nova" (one of two trademark names already registered by Genmar). Further, and more problematically for Pepper, it became evident in early 1999 that two of Genmar's own brands of boats, Ranger and Crestliner, would become the priority of the GMK facility. Specifically, Genmar instructed Pepper that, in the event of production conflicts, GMK should give priority to production of Crestliner boats. Genmar also instructed Pepper to focus all of GMK's engineering efforts on developing fifteen new Ranger boat designs.

---

[2] According to Pepper, when he first started Horizon, he hired an attorney who advised him that the Horizon brand name did not present any potential trademark conflicts.

5

Genmar's focus on the Crestliner and Ranger brands created dual problems for Pepper and GMK. First, the design of new Ranger models was expensive for GMK (who was expected by Genmar to bear all design and production costs) since the dimensions and materials for the Ranger models were completely different than the existing Nova designs. Second, the Ranger models were significantly harder to build than the relatively simple designs of the Nova and Crestliner boats. That fact, combined with GMK's inexperienced workforce,[3] resulted in longer production times and higher costs for the Ranger boats.

Genmar's focus on the Crestliner and Ranger brands also created a dilemma for Pepper. As noted, the parties' written purchase agreement provided that the earn-out consideration to be paid to Horizon/Pepper by Genmar would be based on GMK's gross revenues meeting or exceeding a certain level. However, because GMK was inefficient at building the new Ranger models, and because it received only a set reimbursement for each Ranger boat (equal to its estimated cost of production), it actually lost money on each Ranger boat produced. With respect to the Crestliner boats, GMK also received only a set reimbursement (again equal to its estimated cost of production), and received no revenues from engines, trailers, or accessories sold with the Crestliner boats.

In May 1999, Pepper wrote a lengthy memo to the president and CEO of Genmar,

---

[3] Shortly after the acquisition, Genmar instructed GMK to significantly expand its labor force. Because no other boat manufacturing facilities were located in the Junction City area, GMK was forced to hire a large number of inexperienced workers.

Grant Oppegaard, expressing his concerns over Genmar's strategy for the GMK facility. In pertinent part, the memo stated: "In order to accomplish our goal [of profitability], we need to get good at something quickly. . . . To infuse 15 totally different Ranger models into our manufacturing operations would spell disaster at this time." Id. at 1328. Pepper received no response to his memo. Instead, Genmar continued to instruct Pepper and GMK to give priority to producing Crestliner and Ranger boats.

By November 1999, GMK's gross revenues and production were far under budget. Specifically, GMK's gross revenues fell $360,000 short of budget, or $222,000 actual gross revenues versus $582,000 budgeted gross revenues. At the same time, GMK's backlog of orders for Nova boats grew by more than 300,000 units to a total of 616,000 units. The results for December 1999 were similar. GMK's gross revenues fell $209,000 short of budget, or $372,000 versus $581,000. GMK's controller and vice-president of finance attributed these problems to Genmar's continued focus on Crestliner and Ranger boats at the expense of Nova boats.

On December 21, 1999, Pepper was called to a meeting at Genmar's corporate offices in Minneapolis, Minnesota. During the meeting, Oppegaard criticized Pepper's performance as president of GMK and effectively demoted him, offering him an undefined engineering position with Genmar. Oppegaard further instructed GMK to cease production of Nova pontoon and deck boats, and to increase its emphasis on production of Ranger boats.

In February 2000, Pepper asked to meet with Oppegaard to address his concerns about the detrimental effect of Genmar's strategies on Horizon's and Pepper's ability to achieve the earn-out consideration in the purchase agreement. One of Oppegaard's junior executives refused Pepper's request, stating Oppegaard was "not interested in talking about your contracts at all." Id. at 1386.

On April 5, 2000, Genmar terminated Pepper, his daughter, and his son-in-law from their respective positions at GMK. Under the terms of his employment contract with Genmar, Pepper was prohibited from working in the recreational boat manufacturing industry for a period of two years. Following plaintiffs' terminations, Genmar began converting, or "flipping," GMK's existing Nova dealers to other Genmar brands. Id. at 2275. Effective July 2001, GMK, at Genmar's direction, completely stopped manufacturing the Nova brand of boats.

Genmar closed the GMK facility in May 2002 and consolidated manufacturing of its aluminum boats into another facility. According to Genmar's estimates, it lost approximately $15 million dollars on the GMK transaction, and GMK never showed a profit. Genmar acknowledged, however, that during the years of GMK's operation, the Ranger and Crestliner subsidiaries were profitable, as was Genmar as a whole. Genmar further acknowledged these profits were attributable, in part, to production of boats at the GMK facility. Genmar also acknowledged its Crestliner manufacturing plant, which prior to the Horizon acquisition produced Ranger aluminum boats, performed better from a

8

financial standpoint after the Ranger production was shifted to the GMK facility. Finally, Genmar acknowledged that it continues to manufacture and sell boats based on designs created by Pepper.

II.

On April 20, 2001, plaintiffs (Horizon, Pepper, his daughter, and son-in-law) filed suit against Genmar. Plaintiffs subsequently filed an amended complaint adding Genmar Industries and GMK as defendants. Horizon and Pepper asserted claims for fraud, breach of the purchase agreement, and tortious interference with contract. Pepper's daughter asserted a claim for gender discrimination in employment. The three individual plaintiffs asserted claims of retaliation and breaches of their respective employment agreements.

Prior to trial, the district court granted summary judgment in favor of the Genmar defendants on (1) Pepper's claim for breach of employment agreement, (2) John O'Tool's claim for retaliatory discharge, and (3) Horizon's and Pepper's claim for tortious interference. Plaintiffs' surviving claims were tried to a jury in November 2002. The jury found in favor of Pepper and Horizon on their claim for breach of the purchase agreement and awarded them $2.5 million in damages. The jury also found in favor of Cassandra and John O'Tool on their claims for breach of employment contracts. The jury found against plaintiffs and in favor of defendants on the remaining claims.

Following the district court's entry of judgment, defendants filed a renewed motion for judgment as a matter of law, or for remittitur or a new trial. Plaintiffs filed a

motion to alter or amend the judgment challenging the rate of interest ordered by the district court, as well as a motion for attorney fees, costs, and expenses. The district court denied defendants' motion, granted plaintiffs' motion to alter or amend the judgment only to the extent of correcting a typographical error in the original judgment, and granted in part and denied in part plaintiffs' motion for fees, costs, and expenses.

III.

*Judgment as a matter of law - breach of contract claim*

Defendants contend the district court erred in denying their motion for judgment as a matter of law on the breach of contract claim asserted by plaintiffs Horizon and Pepper. We review de novo the denial of a motion for judgment as a matter of law (JMOL), applying the same standard as the district court. See Hardeman v. City of Albuquerque, 377 F.3d 1106, 1112 (10th Cir. 2004). "In reviewing the district court's refusal to grant JMOL," we draw "all reasonable inferences in favor of the nonmoving party." Id. (internal quotations omitted). "The district court's refusal to grant JMOL will only be reversed if the evidence points but one way and is susceptible to no reasonable inferences supporting the party opposing the motion." Id. (internal quotations omitted).

It is uncontroverted that the parties' written purchase agreement contains a choice-of-law provision stating, in pertinent part, that the agreement "shall be construed, governed by and enforced in accordance with the internal laws of the state of Delaware." Aplt. Addendum, Vol. 1, Doc. 55 at 54. Because Kansas generally recognizes such

10

contractual choice-of-law provisions, see Brenner v. Oppenheimer & Co., 44 P.3d 364, 375 (Kan. 2002) ("Where the parties to a contract have entered an agreement that incorporates a choice of law provision, Kansas courts generally effectuate the law chosen by the parties to control the agreement."), we are bound to apply Delaware law in interpreting and enforcing the parties' agreement. See BancOklahoma Mortgage Corp. v. Capital Title Co., 194 F.3d 1089, 1103 (10th Cir. 1999) ("A federal court sitting in diversity applies the substantive law, including choice of law rules, of the forum state.") (internal quotations omitted); id. ("This rule also applies when a federal court exercises supplemental jurisdiction over state law claims in a federal question lawsuit.").

During the district court proceedings, Pepper and Horizon asserted alternative theories in support of their breach of contract claim: (1) that defendants breached the express terms of the parties' written purchase agreement; and (2) that defendants breached the implied covenant of good faith and fair dealing associated with the agreement. Defendants challenged both theories in their motion for JMOL. In denying defendants' motion, the district court concluded "there was ample evidence presented at trial to support" the implied covenant theory, and accordingly "decline[d] to address" the breach of express terms theory. Aplt. App. at 806. On appeal, the parties likewise focus almost exclusively on plaintiffs' implied covenant theory.[4]

_____

[4] Because we conclude the evidence presented at trial was sufficient to support a finding in favor of Pepper and Horizon on their breach of implied covenant theory, we find it unnecessary to determine whether the evidence was sufficient to establish a breach

11

"Under Delaware law, an implied covenant of good faith and fair dealing inheres in every contract." Chamison v. Healthtrust, Inc., 735 A.2d 912, 920 (Del. Ch. 1999). "As such, a party to a contract has made an implied covenant to interpret and to act reasonably upon contractual language that is on its face reasonable." Id. "This implied covenant is a judicial convention designed to protect the spirit of an agreement when, without violating an express term of the agreement, one side uses oppressive or underhanded tactics to deny the other side the fruits of the parties' bargain." Id. "It requires the [finder of fact] to extrapolate the spirit of the agreement from its express terms and based on that 'spirit,' determine the terms that the parties would have bargained for to govern the dispute had they foreseen the circumstances under which their dispute arose." Id. at 920-21. The "extrapolated term" is then "implie[d] . . . into the express agreement as an implied covenant," and its breach is treated "as a breach of the contract." Id. "The implied covenant cannot contravene the parties' express agreement and cannot be used to forge a new agreement beyond the scope of the written contract." Id.

The overarching theme of the breach of implied covenant theory asserted by Pepper and Horizon is "that Genmar's entire course of conduct frustrated and impaired [their] realization of the Earn-Out" provided in the parties' agreement. Aplee. Br. at 19. In particular, Pepper and Horizon point to the following actions taken by Genmar following its acquisition of Horizon: (1) changing the brand name of the boats from

_____

of the express terms of the parties' agreement.

Horizon to Nova; (2) immediately shifting GMK's production priority from Horizon/Nova boats to Ranger and Crestliner boats; (3) requiring GMK, rather than Ranger or another subsidiary, to bear the costs of designing and producing the new line of Ranger boats; (4) failing to give Pepper operational control over GMK; (5) reimbursing GMK only at "standard cost" for the manufacture of Ranger and Crestliner boats, thereby impairing realization of the earn-out triggers; (6) discontinuing the Horizon/Nova brand of boats; (7) "flipping" Horizon/Nova dealers to other Genmar brands; and (8) shutting down the GMK facility.

Defendants contend all of these actions were expressly contemplated under the terms of the parties' agreement and thus could not form the basis for a violation of the implied covenant of good faith and fair dealing. For reasons discussed below, we disagree.

*Changing name of boats from Horizon to Nova*. The earn-out provision of the parties' agreement stated, in pertinent part, that calculation of earn-out consideration would be based on the sale of "Horizon (or any direct successor) brand boats." Exh. 55 at 3. According to defendants, this language "specifically contemplate[d]" the change from the Horizon brand name to the Nova brand name. Aplt. Br. at 28. Defendants further argue that the brand name change occurred at the same time the agreement was finalized, and thus "was part of the agreement, not a violation of it." Id. at 29.

We reject defendants' arguments. Although it is true the agreement was broadly

13

worded to encompass GMK's sales of any successor brands of boats, there is otherwise no discussion in the agreement of when or how this might occur. Further, in light of the evidence presented at trial, we conclude the jury reasonably could have inferred that defendants fully intended, prior to signing the agreement with Pepper and Horizon, to change the brand name of the Horizon boats, yet failed to reveal that fact to Pepper and Horizon in a timely fashion (i.e., in time to allow Pepper and Horizon to consider it as part of the contract negotiations). Thus, we conclude the immediate brand name change was not expressly contemplated by the terms of the agreement and could have been considered under plaintiffs' breach of implied covenant theory.

*Giving production priority to non-Horizon boats*. The parties' agreement does, as noted by defendants, make reference to GMK producing other Genmar boat brands. For example, the earn-out provision of the agreement indicates that Pepper and Horizon were to receive credit for sales "of Purchaser's boats (Genmar Holdings' brands)." Exh. 55 at 3. Importantly, however, the agreement is otherwise silent with respect to which brand of boats was to receive production priority from GMK. Thus, we conclude defendants' immediate post-acquisition decision to emphasize the production of Ranger and Crestliner boats over the production of Horizon/Nova boats was not expressly contemplated by the terms of the parties' agreement.

*Design and production costs of Ranger boats*. The parties' agreement contains no mention of the fact that GMK would be required to bear the costs of designing and

14

producing a new line of Ranger boats, and defendants do not suggest otherwise.

*Failure to give Pepper operational control over GMK*.  Again, the parties'
agreement contains no mention of precisely how management decisions at GMK would
be made, and defendants do not suggest otherwise.  Defendants, however, point to
language in Pepper's employment contract specifying that he would be "subject to the
general supervision," and would act "pursuant to the orders, advice, and direction," of
Genmar.  Aplt. Br. at 28.  Although this language states the obvious, i.e., that Pepper was
required to answer to and follow the directions of Genmar, it does not expressly address
the issue raised by plaintiffs, i.e., how much authority Pepper retained to determine
production priorities for the GMK facility.

*"Flipping" Horizon/Nova dealers to other Genmar brands*.  Nothing in the
parties' agreement addresses defendants' authority to "flip" Horizon/Nova dealers to
other Genmar brands, and defendants do not assert otherwise.

*Closing GMK facility*.  Finally, nothing in the parties' agreement directly addresses
the possible closing of the GMK facility.  Thus, defendants' decision to close the GMK
facility was not expressly covered or authorized under the terms of the agreement.

Defendants also argue that plaintiffs' "implied covenant claim . . . fails because
there is no evidence the parties would have agreed to the obligations the District Court
imposed by implication."  Aplt. Br. at 21.  For example, defendants contend there is no
"basis to find that the parties 'would have agreed' that Pepper would have complete

15

discretion to refuse to manufacture Ranger and Crestliner boats." Id. at 31. "Nor," defendants argue, "is there any basis to find that the parties 'would have agreed' to maintain the Horizon name." Id.

Defendants' arguments, in our view, ignore the spirit of the parties' agreement. As noted, the agreement expressly stated the purchase price paid by defendants to Pepper/Horizon would be comprised of two components: (1) cash consideration upon closing; and (2) earn-out consideration, based upon GMK meeting or exceeding certain gross revenue goals, for five years following closing. The obvious spirit of this latter component was that Pepper, as president of GMK, would be given a fair opportunity to operate the company in such a fashion as to maximize the earn-out consideration available under the agreement (approximately $5.2 million dollars over five years).

With that spirit in mind, we conclude a reasonable finder of fact could have concluded the parties (had they actually thought about it) would not have simultaneously included within the agreement provisions expressly allowing Genmar to: (1) immediately change the brand name of the boats designed and produced by GMK; (2) set production schedules or priorities that effectively reduced the maximum earn-out consideration available to Pepper; (3) impose significant design and production costs upon GMK for other Genmar brands of boats, while simultaneously limiting the amount of reimbursement GMK could obtain for actually producing other Genmar brands of boats to the "standard cost" of production; or (4) "flip" Horizon dealers to other brands of

16

Genmar boats. See generally Katz v. Oak Indus., Inc., 508 A.2d 873, 880 (Del. Ch. 1986) (stating the legal test for implying contractual obligations is whether it was "clear from what was expressly agreed upon that the parties who negotiated the express terms of the contract would have agreed to proscribe the act later complained of as a breach of the implied covenant of good faith–had they thought to negotiate with respect to that matter").

Lastly, defendants contend there was no evidence that Genmar acted with the intent to harm plaintiffs, i.e., "to injure plaintiff's contractual rights." Aplt. Br. at 32. Instead, defendants contend, "the decisions [plaintiffs] claim[] breached an implied duty constitute nothing other than Genmar's reasonable (although ultimately unsuccessful) business efforts to make the Junction City facility profitable for the first time in its operating life." Id.

In denying defendants' post-trial motion, the district court rejected an identical argument. In particular, the court noted that "copious evidence was presented at trial demonstrating that defendants acted with . . . 'dishonest purpose' or 'furtive design.'" Aplt. App. at 809. For example, the district court noted that "ample evidence" was presented "that defendants had ulterior motives for acquiring Horizon . . ., including the desire to remove a potentially significant competitor from the market and the desire to obtain a facility in the 'southern' market dedicated primarily to the production of Ranger boats." Id. at 809-10. Reduced to its essence, the district court concluded

17

the evidence was sufficient to support the conclusion that defendants believed (but were ultimately incorrect) that they could still turn a profit through the production of Ranger and Crestliner boats at Genmar Kansas while simultaneously preventing Mr. Pepper from realizing any earn-out by stifling the production of Horizon boats and reimbursing Genmar Kansas only at standard cost for the production of other boats.

Id. at 810. After carefully reviewing the trial transcript, we conclude the district court's summary of the evidence is accurate and sufficient to rebut defendants' assertion that there was no evidence they intended to harm plaintiffs. The district court properly denied defendants' motion for JMOL.

*Instruction error - breach of implied covenant of good faith*

In the alternative, defendants contend they are entitled to a new trial on Pepper's and Horizon's breach of contract claim because the district court's jury instructions effectively "excused the jury from affirmatively finding an essential element of" plaintiffs' breach of contract claim. Aplt. Br. at 34. More specifically, defendants contend the district court "instructed the jury that it could find Genmar breached the implied covenant of good faith and fair dealing *without* finding that Genmar had acted in bad faith." Aplt. Br. at 33. "[I]ndeed," defendants argue, "the District Court instructed the jury that it could *presume* bad faith conduct." Id. at 33-34.

We review de novo whether, as a whole, the district court's jury instructions correctly stated the governing law and provided the jury with an ample understanding of the issues and applicable standards. See Reed v. Landstar Ligon, Inc., 314 F.3d 447, 450 (10th Cir. 2002). Because, as discussed above, plaintiffs' breach of contract claim is

18

governed by Delaware law, the question is whether the substance of the district court's

jury instructions concerning that claim were consistent with Delaware law. See id. at 449

(noting "the substance of a jury instruction in a diversity case is a matter of state law").

At the instruction conference, defendants submitted a proposed instruction which

stated, in pertinent part, that "[t]o prove defendants breached the implied duty of good

faith and fair dealing in the Purchase Agreement, plaintiffs must demonstrate that

defendants engaged in conduct of *fraud, deceit or misrepresentation*." Aplt. App. at 831

(emphasis added). The district court rejected this language as inconsistent with Delaware

law. Instead, the district court instructed the jury as follows regarding the breach of

implied covenant claim:

> [T]he law imposes a duty of good faith and fair dealing in every contract.
> This duty is a contract term implied by courts to prevent one party from
> unfairly taking advantage of the other party. This duty includes a
> requirement that a party avoid hindering or preventing the other party's
> performance. The implied covenant of good faith and fair dealing
> emphasizes faithfulness to an agreed common purpose and consistency for
> the justified expectations of the other party. The parties' reasonable
> expectations at the time of the contract formation determines the
> reasonableness of the challenged conduct. A violation of the implied
> covenant of good faith and fair dealing implicitly indicates bad faith
> conduct.
>     In determining whether defendants breached the implied covenant of
> good faith and fair dealing, you may consider whether it is clear from what
> was expressly agreed upon by the parties that the parties would have agreed
> to prohibit the conduct complained of as a breach of the agreement had they
> thought to negotiate with respect to that matter.

Id. at 566 (Instruction No. 12).

In their post-trial motions, defendants renewed their challenge to the district

court's instruction, and cited three Delaware cases in support of their assertion that "fraud, deceit or misrepresentation" was an essential element of plaintiffs' claim for breach of implied covenant of good faith and fair dealing. The first case cited by defendants was <u>Corporate Property Associates 6 v. The Hallwood Group Incorporated</u>, 792 A.2d 993 (Del. Ch. 2002), where a creditor sought a determination of the validity of a letter agreement under which a debtor prepaid principal owed on a $500,000 note in exchange for release of certain claims. The creditor alleged the letter agreement was invalid because, in procuring the creditor's assent, the debtor violated its implied duty to perform an underlying settlement agreement in good faith. In addressing this claim, the Delaware court purported to outline Delaware law governing the "implied duty of good faith and fair dealing [that] inheres in every contract." 792 A.2d at 1002. In doing so, the court stated: "To prove a breach of the implied covenant of good faith and fair dealing, the claimant must also demonstrate that the conduct at issue involved *'an aspect of fraud, deceit or misrepresentation.'*" <u>Id.</u> at 1003 (emphasis added).

The court's language in <u>Corporate Property</u> came from the Delaware Supreme Court's decision in <u>Merrill v. Crothall-American, Inc.</u>, 606 A.2d 96 (Del. 1992), the second Delaware case cited by defendants in their post-trial motion. In <u>Merrill</u>, the plaintiff filed suit against his former employer asserting, in part, a claim for breach of an implied covenant of good faith and fair dealing. The underlying basis for this claim was plaintiff's assertion "that by inducing [him] to accept [a] position without informing him

20

of its intent to replace him as soon as a 'qualified' candidate could be obtained, [his former employer] acted in bad faith." 606 A.2d at 99. The state trial court dismissed the claim and plaintiff appealed. The Delaware Supreme Court, in analyzing the claim, noted its validity hinged on plaintiff's assertion "that an implied covenant of good faith and fair dealing exist[ed] in every employment contract in Delaware." Id. at 101. The court ultimately agreed with this proposition, and outlined what plaintiff had to prove to establish a breach of the covenant:

> We recognize that there is tension between the self-interest which an employer is legally entitled to pursue in all contractual undertakings and the requirement not to overreach in the hiring process. In the absence of statutory or collective bargaining restrictions, the parties to an employment agreement are free to pursue their separate economic goals. An employer may be motivated by its own legitimate business interests when making employment decisions and it may advance those interests, for the most part, however it chooses. We believe, however, that holding an employer to a requirement of good faith when making employment contracts represents a minimal, and wholly justifiable, interference in the management of its business. Such a requirement merely prevents one side from obtaining an unfair advantage when bargaining for a contract. An employer has wide latitude in deciding how it conducts its business including its employment undertakings, but it may not do so by trickery or deceit. We therefore hold that every employment contract made under the laws of this State, consonant with general principles of contract law, includes an implied covenant of good faith and fair dealing.
> What is required for a showing that an implied covenant of fair dealing has been breached is another matter. It has been said that "to constitute a breach of the implied covenant of good faith, the conduct of the employer must constitute 'an aspect of fraud, deceit or misrepresentation.'" We think this characterization of an employer's duty under the covenant is accurate. The lodestar here is candor. An employer acts in bad faith when it induces another to enter into an employment contract through actions, words, or the withholding of information, which is intentionally deceptive in some way material to the contract. Such conduct constitutes "an aspect

21

of fraud, deceit or misrepresentation."

Id. (internal citations omitted).

The third and final case cited by defendants was Cincinnati SMSA Limited
Partnership v. Cincinnati Bell Cellular Systems Company, 708 A.2d 989 (Del. 1998),
which involved a commercial dispute over a noncompete clause in a limited partnership
agreement. The Delaware Supreme Court outlined the principles of good faith and fair
dealing applicable in such contexts:

> Delaware observes the well-established general principle that (absent
> grounds for reformation which are not present here) it is not the proper role
> of a court to rewrite or supply omitted provisions to a written agreement. In
> cases where obligations can be understood from the text of a written
> agreement but have nevertheless been omitted in the literal sense, a court's
> inquiry should focus on "what the parties likely would have done if they
> had considered the issue involved." In the narrow context governed by
> principles of good faith and fair dealing, this Court has recognized the
> occasional necessity of implying such terms in an agreement so as to honor
> the parties' reasonable expectations. But those cases should be rare and
> fact-intensive, turning on issues of compelling fairness.
> The articulation of the standard for implying terms through
> application of the covenant of good faith and fair dealing represents an
> evolution from previous Delaware case law. In Katz v. Oak Industries, Inc.,
> the Court of Chancery stated that the legal test for implying contractual
> obligations was whether it was "clear from what was expressly agreed upon
> that the parties who negotiated the express terms of the contract would have
> agreed to proscribe the act later complained of as a breach of the implied
> covenant of good faith--had they thought to negotiate with respect to that
> matter."
> Delaware Supreme Court jurisprudence is developing along the
> general approach that implying obligations based on the covenant of good
> faith and fair dealing is a cautious enterprise. In the 1992 case of Merrill v.
> Crothall-American, Inc., this Court first recognized the limited application
> of the covenant to inducement representations in at-will employment
> contracts. In that case, the Court was careful to heed the legal right of

employers to pursue a certain amount of self-interest in the creation of contractual relationships. The Court held that, to plead properly a claim for breach of an implied covenant of good faith and fair dealing in the inducement of employment, a plaintiff must allege "an aspect of fraud, deceit or misrepresentation."

Four years later in DuPont v. Pressman, this Court revisited the issue of good faith and fair dealing in at-will employment, this time in the context of a claim for wrongful termination. While citing Katz with approval, we stressed again the narrow scope of the covenant, holding that principles of good faith and fair dealing would hold culpable the acts of an employer directed toward creating fictitious grounds for termination. Under the facts of that case, however, the application of the covenant extended no further, and the general doctrine of at-will employment was otherwise undisturbed.

This Court should be no less cautious or exacting when asked to imply contractual obligations from the written text of a limited partnership agreement.

708 A.2d at 992-93 (footnotes omitted).

In denying defendants' post-trial motion, the district court rejected defendants' assertion that these three cases established "fraud, deceit or misrepresentation" was a necessary element of a claim of breach of the implied covenant of good faith and fair dealing. In doing so, the district court emphasized that Merrill and the cases on which it relied (one from Connecticut and one from Massachusetts) arose in the "limited and unique context of employment-at-will" in which the "parties . . . are generally not subjected to any good faith standard." Aplt. App. at 832-33. Given this context, the district court concluded, implication of anything more than a narrow duty of good faith and fair dealing would "wholly defeat[] the benefit for which the parties bargained–the employer's ability to discharge the employee and the employee's ability to quit his or her employment for good reason, bad reason or no reason at all." Id. at 832. In contrast, the

23

district court noted, "the implied covenant of good faith and fair dealing–as it is typically applied (i.e., without a requirement of fraud)–does not conflict with the benefit for which parties to a commercial transaction generally bargain." Id. at 833. Thus, the district court concluded, the "court in Corporate Property incorrectly incorporated into the commercial context the 'fraud, deceit or misrepresentation' language from the employment-at-will context of Merrill." Id. As for Cincinnati Bell, the district court concluded the Delaware Supreme Court "was simply stressing the narrow scope of the implied covenant," and that there was otherwise "no indication . . . that the court utilized the fraud standard of Merrill in resolving the appeal." Id. at 835. Further, the district court opined "that the Delaware Supreme Court, if faced with the issue, would refuse to adopt such a requirement" in the context of a commercial contract. Id. Lastly, the district court concluded that "defendants' construction of Delaware law on good faith and fair dealing [wa]s illogical as it would render a good faith and fair dealing claim entirely duplicative of a fraud claim." Id.

On appeal, defendants rely on the same three Delaware cases, and the same arguments based on those cases, that they presented to the district court in their post-trial motion. Succinctly stated, defendants argue the Delaware Supreme Court's decision in Cincinnati Bell "expressly holds that the standards governing the implied covenant of good faith and fair dealing in at-will employment relationships also apply to commercial contracts." Aplt. Br. at 36.

24

Contrary to defendants' arguments, we are not persuaded the Delaware Supreme Court has spoken clearly to the issue now before us, i.e., whether, in the context of a commercial contract, a claim for breach of the implied covenant of good faith and fair dealing requires proof of "fraud, deceit, or misrepresentation." To be sure, in <u>Cincinnati Bell</u>, the Delaware Supreme Court discussed its prior holding in <u>Merrill</u>. The court did so, however, in the context of tracing the history of its recognition and application of the implied covenant. <u>See</u> 708 A.2d at 992 ("The articulation of the standard for implying terms through application of the covenant of good faith and fair dealing represents an evolution from previous Delaware case law."). Thus, in discussing <u>Merrill</u>, the Delaware Supreme Court was careful to emphasize both the unique context of that case, i.e., "inducement representations" occurring "in at-will employment contracts," and its "limited application of the covenant" in that context given "the legal right of employers to pursue a certain amount of self-interest in the creation of contractual relationships." 708 A.2d at 992. There is no indication the Delaware Supreme Court actually applied the <u>Merrill</u> standard to the commercial contract before it in <u>Cincinnati Bell</u>. Instead, the Delaware Supreme Court simply stated that, given the history and evolution of the implied covenant, it "should be no less cautious or exacting when asked to imply contractual obligations" in a commercial setting. <u>Id.</u> at 993.

It is true that the Court of Chancery of Delaware, in <u>Corporate Property</u> and at least one subsequent case, <u>Continental Insurance Company v. Rutledge & Company</u>, 750

25

A.2d 1219, 1234 (Del. Ch. 2000), has applied Merrill's "fraud, deceit or misrepresentation" requirement in the context of commercial contracts. Those cases are not binding on us, however, and at best are simply "some evidence of how the state supreme court would decide the issue." Clark v. State Farm Mut. Auto. Ins. Co., 319 F.3d 1234, 1240 (10th Cir. 2003). Further, we agree with the district court that there is a compelling reason for disregarding these cases: neither acknowledged the fact that Merrill concerned an employment-at-will contract, and thus neither addressed head-on the question of whether the standard announced in Merrill should be applied in the context of commercial contracts.

Thus, we are left to predict whether the Delaware Supreme Court, if squarely faced with the issue, would apply Merrill's "fraud, deceit or misrepresentation" standard to a breach of implied covenant claim arising in the context of a commercial contract dispute. For the reasons that follow, we conclude the Delaware Supreme Court would not do so, and would instead adopt and apply a broader definition of "bad faith."

It is beyond dispute that at-will employment contracts, such as the one at issue in Merrill, differ significantly from commercial contracts. In particular, unlike a typical commercial contract, either party to an at-will employment contract can "terminate the . . . relationship at any time for any reason." Susan Dana, The Covenant of Good Faith & Fair Dealing: A Concentrated Effort to Clarify the Imprecision of its Applicability in Employment Law, 5 Transactions: Tenn. J. Bus. L. 291, 293 (Spring 2004). Thus, many

26

courts have refused to imply a covenant of good faith and fair dealing into at-will employment contracts. See id. at 297. Although the Delaware Supreme Court adopted the opposite stance in Merrill, it clearly did so in as narrow a fashion as possible in order to preserve an employer's "wide latitude in deciding how it conducts its business including its employment undertakings."[5] Merrill, 606 A.2d at 101. In the context of a typical commercial contract, however, there is no similar concern, and thus no compelling basis for limiting application of the implied covenant to the specific circumstances outlined in Merrill.

The notion that the definition of "good faith" in the context of a commercial contract would differ from that in the context of an at-will employment contract is supported by Restatement (Second) of Contracts § 205, which has been embraced by the Delaware Supreme Court. See E.I. DuPont de Nemours & Co. v. Pressman, 679 A.2d 436, 443 (Del. 1996) (citing § 205); Pierce v. Int'l Ins. Co. of Illinois, 671 A.2d 1361, 1366 (Del. 1996) (same); see also Echols v. Pelullo, 377 F.3d 272, 280 (3d Cir. 2004) (noting Delaware has embraced the Restatement of Contracts in general). In particular, § 205, which generally provides that "[e]very contract imposes upon each party a duty of

_____

[5] Ironically, had the Delaware Supreme Court decided not to recognize the covenant of good faith and fair dealing in at-will employment contracts, we likely would not have been faced with the arguments we are now addressing. In other words, in the absence of Merrill's reference to "fraud, deceit or misrepresentation," defendants would have little support for their assertion that the district court erroneously instructed the jury with respect to plaintiffs' breach of implied covenant theory.

good faith and fair dealing in its performance and its enforcement," recognizes that "[t]he phrase 'good faith' is used in a variety of contexts, and *its meaning varies somewhat with the context*." Restatement (Second) of Contracts § 205 & cmt. a (emphasis added).

In the context of a commercial contract dispute such as the one at issue here, we believe the Delaware Supreme Court would read § 205 as supporting a broader definition of "bad faith" than the one adopted in Merrill. According to § 205, good faith performance of a contract can "exclude[] a variety of types of conduct characterized as involving 'bad faith' because they violate community standards of decency, fairness or reasonableness." Id. cmt. a. Although § 205 states that "[a] complete catalogue of types of bad faith is impossible," it notes that bad faith may include "evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance." Id. cmt. d.

Section 205 also provides an illustration that we believe supports our conclusion that the Delaware Supreme Court would, in the context of a commercial contract dispute, apply a broader bad faith standard than the one announced in Merrill:

> A, owner of a shopping center, leases part of it to B, giving B the exclusive
> right to conduct a supermarket, the rent to be a percentage of B's gross
> receipts. During the term of the lease A acquires adjoining land, expands
> the shopping center, and leases part of the adjoining land to C for a
> competing supermarket. Unless such action was contemplated or is
> otherwise justified, there is a breach of contract by A.

Id. cmt. d, illus. 2. Although this example obviously differs factually from the case at

28

hand, it nevertheless illustrates that a breach of the duty of good faith and fair dealing in the context of a commercial contract can occur in the absence of "fraud, deceit or misrepresentation." In the example, A may have had no intention at the time it entered into the contract with B to expand its shopping center, and thereafter may not have discussed with B its decision to expand the center and allow a second grocer to occupy space in the adjoining land. In other words, even though there may have been nothing in A's conduct that could be classified as "fraud," "deceit," or "misrepresentation," its conduct nevertheless constitutes a breach of the duty of good faith and fair dealing implied in its contract with B.

Lastly, we agree with the district court that imposing <u>Merrill</u>'s "fraud, deceit or misrepresentation" standard in the context of a commercial contract dispute would render a breach of implied covenant claim nearly indistinguishable from a fraud claim. Having found no compelling contextual justification for doing so (i.e., similar to the one in <u>Merrill</u>), we conclude the Delaware Supreme Court would continue to recognize a distinction between the two claims. <u>See</u> <u>generally</u> <u>Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund</u>, 624 A.2d 1199, 1208 n.16 (Del. 1993) (noting "that the definition of 'fraud' is distinct from that of 'bad faith'").

In sum, we conclude the district court's instructions to the jury were consistent with Delaware law and thus provide no basis for a new trial. <u>See</u> <u>True North Composites, LLC v. Trinity Indus., Inc.</u>, 191 F. Supp. 2d 484, 517-18 (D. Del. 2002) (employing

29

identical instruction explaining Delaware law on duty of good faith and fair dealing, and rejecting assertion that Delaware law requires explicit showing of bad faith).

*Judgment as a matter of law - damages under the purchase agreement*

Defendants contend that, even if plaintiffs in fact established a breach of the purchase agreement, the jury's damage award "is fatally flawed and must be vacated." Aplt. Br. at 39. According to defendants, Delaware law prohibits a plaintiff from recovering lost profits for an enterprise, such as GMK, that has never achieved profitability. Further, defendants assert that Horizon "failed to present sufficient evidence to support an award of lost earn-out consideration under traditional contract damages standards, which require reasonable certainty." Id.

Defendants raised these same arguments in the context of their post-trial motion for JMOL. As previously noted, we review de novo the denial of a motion for JMOL, applying the same standard as the district court. See Hardeman, 377 F.3d at 1112.

Defendants' first argument is based on the so-called "new business" rule. "This rule provides that, as a matter of law, a new or unestablished business cannot recover lost profits because absent a history of past profits, future profits are too uncertain, contingent, and speculative." Bernadette J. Bollas, The New Business Rule & the Denial of Lost Profits, 48 Ohio St. L. J. 855 (1987). Notably, the Delaware Supreme Court has not expressly adopted or rejected the new business rule. Thus, we are again called on to predict how the Delaware Supreme Court would rule if faced with the issue. See Clark,

30

319 F.3d at 1240.

The trend in most states over the past fifteen to twenty years has been away from strict application of the new business rule. See MindGames, Inc. v. Western Publ'g Co., 218 F.3d 652, 656 (7th Cir. 2000) (noting the "new business" rule "has been abandoned in most states that once followed it"); TK-7 Corp. v. Estate of Barbouti, 993 F.2d 722, 726 (10th Cir. 1993) (stating "many states have abandoned the strict new business rule"); Bollas, supra, 48 Ohio St. L.J. at 859 (noting, in "[t]he clear and growing majority of courts," "the new business rule merely restates and emphasizes the evidentiary requirement that a new business, like an existing business, must prove profits with reasonable certainty"). The "courts [in these states] have recognized that a strict application of the rule could encourage tortious behavior or the breaking of contracts by those dealing with new businesses." TK-7 Corp., 993 F.2d at 726. "Instead of a strict bar on such claims, many courts now hold that, regardless of whether a business is new or is established, lost profits can be recovered if it is possible to show by competent evidence and with reasonable certainty that profits would have been made and the amount of those profits." Id.

In our view, the Delaware Supreme Court's decision in Moody v. Nationwide Mutual Insurance Company, 549 A.2d 291 (Del. 1988), suggests the court would, if directly faced with the issue, follow the national trend and refuse to adopt a strict application of the "new business" rule. In Moody, the plaintiff filed suit against his

31

insurance carrier to recover benefits for lost wages and medical expenses resulting from his injury in an automobile accident. The evidence at trial indicated that, eight days prior to the accident, the plaintiff and his business partner opened a new car wash. Plaintiff's evidence of lost wages "consisted of his testimony and his only business record–a photocopy of a single page ripped out of a small three ring notebook." Id. at 292. This document "reflected total business gross receipts for the first week of $707." Id. The plaintiff "testified that his net share for the first week's receipts was determined by subtracting certain estimated expenses from gross receipts." Id. The trial court granted a directed verdict against the plaintiff "based on his failure to present sufficient evidence of lost wages upon which a jury could return a verdict in his favor." Id. at 291. On appeal, the Delaware Supreme Court reversed the trial court, concluding plaintiff "presented sufficient evidence to justify submission of his claim to the jury." Id. In reaching this conclusion, the court emphasized "the potential deficiencies in [the plaintiff's] testimony relate to his credibility and should be resolved by the jury, rather than by the trial judge on a motion for a directed verdict." Id. at 294. Indeed, the court noted, "questions concerning [plaintiff's] credibility and the quality of his supporting evidence will undoubtedly be the focus of [the insurer's] defense and upon remand, will ultimately be determined by the jury." Id.

Although two justices dissented from the decision in Moody, their dissenting opinion arguably can be read as a signal that the court would repudiate strict application

32

of the new business rule. In particular, the two dissenting justices briefly mentioned the "new business" rule and cited Re v. Gannett Co., Inc., 480 A.2d 662, 668 (Del. Super. Ct. 1984), that had, in the context of a libel action, applied the "general rule" that "evidence of expected profits from a new business is too speculative, uncertain and remote to be considered where there is no history of prior profits." Notwithstanding this decision, the two dissenting justices concluded the trial court in the case before it had "implicitly and, in [their] view, properly rejected application of the 'new business rule' to" the case before them. Moody, 549 A.2d at 295. Further, the two dissenting justices noted there were "exceptions to the requirement of proof of lost profits to a reasonable certainty, even as to new businesses." Id. Ultimately, however, the two dissenting judges agreed with the trial court that plaintiff "failed to . . . come forward with the best evidence of his business' profitability that the circumstances would permit." Id. at 296.

In sum, given the general national trend, as well as the decision in Moody, we conclude the Delaware Supreme Court would, if directly faced with the issue, follow the majority trend and reject strict application of the "new business" rule. Thus, defendants are not entitled to JMOL on this point.

That leaves only defendants' assertion that the evidence presented at trial was insufficient to support the jury's determination of damages. According to defendants, "Horizon failed to present any evidence to show either that it *was*, in fact, damaged, or if so, *in what amount*." Aplt. Br. at 21 (emphasis in original). In particular, defendants

33

assert plaintiffs failed "to give the jury *any* basis to rationally project GMK's hypothetical results absent breach – *i.e.*, its sales, revenues, expenses, product mix, or the timing of any of the foregoing," and thus "left the jury with nothing but sheer speculation, and its own sense of 'fairness,' on which to rest a damage award." Id. at 23.

The applicable standard of proof for damages in this case was set forth in the district court's jury instructions and was agreed to by defendants. "Pepper and Horizon are entitled," as a result of Genmar's breach of the contract, "to compensation in an amount that will place them in the same position they would have been in if the purchase agreement had been properly performed." Aplt. App. at 567 (Instruction No. 13). "The measure of damages is the loss actually sustained as a result of the breach of the purchase agreement." Id.

After carefully reviewing the trial transcript, we conclude the evidence was sufficient to support the jury's damage award. Pepper testified at trial that, during the 1998 fiscal year, Horizon was making "significant progress" and he believed if it continued doing what it was doing (i.e., building and selling relatively inexpensive aluminum jon boats to an expanding dealer base), the company would begin showing a profit. In light of Pepper's wealth of experience in the recreational boating industry, the jury reasonably could have believed this testimony and found that Horizon would have become profitable if it continued with Pepper's intended business strategy. The jury also reasonably could have concluded, based on evidence concerning the negotiations between

34

Genmar and Horizon, that the Genmar acquisition would have allowed Horizon/GMK to achieve an even greater profit margin as a result of the purchasing power, and thus lower material costs, provided by Genmar. See Aplt. App. at 1193 (testimony of Pepper indicating Genmar's CEO "talked about [Genmar's] buying power in buying engines and how we could become that much more profitable with our own brand by using the purchasing power that they had on engines and aluminum and all these things"). In terms of the earn-out consideration in the parties' purchase agreement, Pepper testified that, prior to the acquisition, Genmar's CEO assured him the full amount of the earn-out consideration ($5.2 million) was obtainable. Genmar's CFO (Roger Cloutier) also admitted under cross-examination that, if Pepper had been allowed to focus on producing Horizon/Nova boats, he would have achieved at least some of the earn-out consideration available under the purchase agreement. This admission was consistent with a pre-acquisition memorandum prepared by Genmar's CFO projecting immediate post-acquisition profits from GMK. Given all this evidence, the jury reasonably could have concluded that, if Genmar had acted in good faith after the acquisition and allowed Pepper and GMK to focus on producing Horizon/Nova boats rather than Ranger and Crestliner boats, Pepper and Horizon would have achieved at least some of the earn-out consideration available to them under the purchase agreement.

The fact that the jury awarded only half of the earn-out consideration available under the purchase agreement can be attributed to two factors (whether considered

35

separately or together). First, the jury reasonably could have found that GMK would not have achieved profitability immediately following the acquisition, and that it would have taken a period of time for the company to achieve profitability under Pepper's original business model. Second, the jury reasonably could have concluded that, by simultaneously producing some amount of Crestliner and Ranger boats, the GMK facility's gross revenues, and in turn the available earn-out consideration, would have been reduced to some degree (as compared to a situation in which GMK could have focused exclusively on manufacturing its own brand of boats).

## *Cross-Appeal*

When the district court entered judgment on the jury's verdict on November 21, 2002, it ordered that Pepper and Horizon should recover on their breach of contract claim "the sum of $2,500,000.00, with interest thereon at the rate of 1.46 percent per annum as provided by law." Aplt. App. at 836. Plaintiffs filed a motion to alter or amend the judgment, arguing the district court should have ordered interest at the parties' contractually agreed interest rate of 2 percent per month.[6] The district court denied

---

[6] Section 13.2(b) of the parties' purchase agreement provides as follows:
> In the event that the Non-Defaulting Party is entitled to receive an amount of money by reason of the Defaulting Party's default hereunder, then, in addition to such amount of money, the Defaulting Party shall promptly pay to the Non-Defaulting Party a sum equal to interest on such amount of money accruing at the rate of 2% per month (but if such rate is not permitted under the laws of the State of Delaware, then at the highest rate which is permitted to be paid under the laws of the State of Delaware) during the period between the date such payment should have been made

36

plaintiffs' motion. Although it agreed that plaintiffs and defendants were free to contract

for an interest rate other than that specified in 28 U.S.C. § 1961,[7] it concluded plaintiffs

had waived their right to assert the interest rate contained in the purchase agreement "by

not preserving their claim of entitlement to such rate in the pretrial order and by failing to

raise the issue until after the entry of judgment." Id. at 837.

In their cross-appeal, plaintiffs contend the district court erred in concluding that

they waived their right to assert the contractually agreed-upon rate of post-judgment

interest. According to plaintiffs, the issue of post-judgment interest "was not ripe" at the

time the parties submitted the pretrial order, since "there was no judgment" and "no

failure by Defendants to promptly pay." Aplee. Br. at 53. Further, plaintiffs argue the

district court's pretrial order form "includes no specific requirement that any rate of post-

judgment interest (whether contractually agreed or otherwise) be included in the Pretrial

Order." Id. at 54.

To the extent a district court's award of post-judgment interest involves statutory

interpretation of 28 U.S.C. § 1961, we apply a de novo standard of review. See

Westinghouse Credit Corp. v. D'Urso, 371 F.3d 96, 100 (2d Cir. 2004). If, however, the

district court's award of post-judgment interest is challenged on some other basis, we

---

hereunder and the date of the actual payment thereof.
Exh. 55 at 54.

[7] Although defendants dispute the validity of this ruling in their response to plaintiffs' cross-appeal, we find it unnecessary to address the issue.

37

apply an abuse of discretion standard. See Citicorp Real Estate, Inc. v. Smith, 155 F.3d 1097, 1107 (9th Cir. 1998); Allen Archery, Inc. v. Browning Mfg. Co., 898 F.2d 787, 791 (Fed. Cir. 1990). Here, plaintiffs' challenge clearly does not involve the interpretation of § 1961; rather, it hinges on the fact-intensive question of whether they are procedurally barred from seeking the rate of post-judgment interest set forth in the parties' purchase agreement. Thus, we apply an abuse of discretion standard in reviewing the district court's decision.

After examining the record on appeal, we are not persuaded the district court's decision was "arbitrary, capricious, whimsical, or manifestly unreasonable." Ralston v. Smith & Nephew Richards, Inc., 275 F.3d 965, 968 (10th Cir. 2001) (internal quotations omitted) (defining when a district court abuses its discretion). As noted by the district court, "it is beyond dispute that plaintiffs could have raised the issue prior to judgment." Aplt. App. at 844. Although the district court's pretrial order form may not have specifically listed post-judgment interest as a potential issue, plaintiffs' counsel nonetheless could have sought to include that matter in the pretrial order, particularly since, as noted by the district court, plaintiffs' entitlement to the agreed-upon rate was "not necessarily a 'given.'" Id. Alternatively, plaintiffs could have filed a pretrial motion alerting the district court and defendants to their assertion of entitlement to a post-judgment interest rate higher than the one set forth in § 1961. As noted by the district court, plaintiffs deprived defendants of two opportunities by failing to do so. First,

38

defendants were deprived of the opportunity "to ascertain whether they had any good faith factual arguments to raise" concerning the interpretation of the interest-rate provision of the purchase agreement. Id. at 846. Second, defendants were deprived of the opportunity "to assess fully the risk of bringing th[e] case to trial," given the extremely high rate of interest set forth in the purchase agreement. Id. Accordingly, we conclude the district court did not err in refusing to impose post-judgment interest at the rate set forth in the parties' purchase agreement.

AFFIRMED.